# EXHIBIT B

# J. D. OBENBERGER
## AND ASSOCIATES
### ATTORNEYS AND COUNSELORS-AT-LAW

SUITE 3700
THREE FIRST NATIONAL PLAZA
70 WEST MADISON STREET
CHICAGO, ILLINOIS 60602

J. D. OBENBERGER
REED LEE

☎(312) 558-6420
FAX (312) 558-7773
E-MAIL OBIWAN@XXXLAW.NET

July 7, 2009

Gavin L. Charlston, Esq.
Cooly Godward Kronish LLP
101 California Street – Fifth Floor
San Francisco, CA 94111

Via email only to: gcharlston@cooley.com

Re: Faceporn, Your Letter of June 16, 2009 to Domains by Proxy

Dear Mr. Charlston

Your letter dated June 16, 2009, to Domains by Proxy, Inc., has been forwarded to us for reply on behalf of those who operate the Faceporn website at URL www.faceporn.com in Europe and the European entity that owns it. That letter raises a number of traditional trademark and closely related concerns and, in passing, one that is not traditional at all.

As for your traditional concerns that the domain name in question is confusingly similar and that it will divert Internet users searching for the Facebook website, we do not see how this domain name poses any greater concerns along these lines than does the domain name used by the Foundation for American Christian Education (www.face.net) or that used to sell a book about cosmetic surgery (www.facelift.com). Surely the similarity, even identity, between one syllable followed by others does not alone establish trademark infringement or related torts. "General Motors" shares more than a single syllable with "General Mills," and yet both have been used without confusion for many decades to designate different goods from different sources. The same would seem to be true of Faceporn and Facebook, especially given the explosive semantic force of the "porn" syllable in contemporary culture. It is very likely that anyone seeing "Faceporn" will be far more moved by the connotations of "porn" rather than those of "face," and confusion is most unlikely, especially because one will not find any porn at all on the Facebook website (which we take to be the thrust of your tarnishment comment, addressed below).

The operators of the Faceporn website do not intend to appropriate Facebook's good will or to trade on its brand (in any of the broad senses of "brand," some of which are quite properly protected by law and some of which are not). They do not wish to divert web searches or to pretend to any authorization by or connection with Facebook. The operators of Faceporn tell us that a standard Google® search for the term "facebook" yields precisely zero hits for Faceporn.com. (That is not an accident but a function of intent and design.) In fact these operators are quite willing to include an express disclaimer on the Faceporn website directly disabusing the public of any notion that there is

some authorization or other connection between Faceporn and Facebook: Though they have considered doing so, the only reason that they have not yet included any such disclaimer is out of concern that, if they did so, the Faceporn site would be returned by standard Internet search engines on a request for "Facebook." There may well be a technical solution to this particular problem, and if a disclaimer and even a direct, single-click link to the Facebook site (for those interested in it) would be helpful to you, then the operators stand quite ready to effect such modifications. Our clients believe that essentially no one looking at Faceporn imagines any connection or affiliation with Facebook. It is not entirely clear that Facebook even comes to mind when users visit Faceporn; Our clients doubt that the first syllable of its protected name is so closely associated with the whole of its name as to bring it to mind whenever the word "Face" is used in a domain name, and is conjured up less than otherwise might be the case because of the force of the "porn" syllable. But even if it comes to mind at least sometimes in some people, to the extent that it does, the counterpoint between the restrictive policies concerning frank erotica that Facebook imposes upon its users, in contrast with the tolerant policies of Faceporn, may even approach parody or something closely akin to it with similar constitutional protection; Our clients think that really no one confuses the two or associates them or attributes anything about either to the other – at least insofar as they presently operate.

Contrary to the assertions contained in the June 16, letter, there has been no copying whatsoever. Not one element of code belonging to Facebook has been utilized by Faceporn. They abandoned the use of the "F in a Box Design" to which your letter refers, apparently even before your letter reached us, and at the same time other modifications were made in the proportion of design elements and in their color. They are in the process of again redesigning the typeface of the logo and the colors used by the Faceporn website - and they are prepared to make bolder and more dramatic changes demonstrating more contrast between the sites in issue, should that contribute to a resolution of this dispute. Beyond this, we invite you to specify what other site design elements, if any, concern you. Obviously many of the basic site design elements are functional and thus widely and quite properly shared by many web sites. But if there are other non-functional elements which you believe are protected in the hands of Facebook, let us know. A redesign which takes care of the concerns mentioned here can be accomplished very promptly: We can commit to you that we will consider and respond to any additional concerns which you may raise along these lines (although we cannot, of course, say in advance that we will agree with you on all of them). We note in passing that Faceporn still operates in a test mode and has not been marketed to an American audience: This status creates a flexibility which can be used toward the resolution or diminution of this dispute between our principals.

As mentioned above, the Faceporn operators have no desire to trade on or profit from Facebook's good will or its properly protected intellectual property. Their registration of the URL in question was made and is used in good faith for their own proper business purposes through their business entity, purposes unrelated to Facebook. We do not believe that this situation poses the elements of a statutory "cybersquatting" claim. Similarly, we do not believe that any of the concerns you raise renders faceporn's use of the URL in question improper or subject to forfeiture or other involuntary transfer.

Finally, moving away from concerns traditionally protected by law, you raise – in passing – a "tarnishment" concern. Even if "Faceporn" were sufficiently similar to "Facebook" (and even if the other statutory requisites were present), it seems to us that "Faceporn" would escape sanction even should the new antidilution provisions be constitutionally valid. Fair use is, of course, expressly non-infringing. Given that Facebook runs a popular social networking site which restricts its participants from disseminating frank and graphic sexually oriented expression – even if it interests and does not offend all of those who see it – it is both inevitable and constitutionally protected that

others will operate web sites less prudish in character. No matter how famous or how distinctive the Facebook mark is or becomes, it cannot stand in the way of this sort of development. Nor does the law give any proper or valid protection to Facebook from a web site which is likely to be understood and appreciated by its users as 'something like Facebook but without the censorship" and operated by different and distinct operators with more tolerant attitudes, operators who expressly facilitate the formation of a community interested in the open and unhampered exchange of ideas about sexuality and explicit erotica to illustrate that exchange. The free and comparatively unrestricted distribution of images at Faceporn that you seemingly identify as content tarnishing Facebook are seen by others as a part of a dynamic social sexual liberation. Faceporn is a small element in a broad, slow wave that transforms social attitudes within and from its sphere; Our clients believe that the difference between its sphere and that occupied by your clients is dramatically outlined and vividly identified - and that the nonintersection of those respective spheres is plain to any honest observer. It is not the situation that the explicit content in Faceporn tarnishes the name and repute of Facebook: To the contrary, that content makes the differences between them crystal-clear and demolishes any notions of association or similitude. That content makes it clear that the sites do not compete for the same audience and that – at present – the content of neither reflects upon the content, name, or identity of the other. If your client wishes to have the Faceporn operators make that difference even clearer, this letter invites your suggestions.

We have seriously considered the issues raised in your letter; and we have tried to address them in a careful and constructive way. We recognize that you may have some responses to what we say here, and we invite you to let us know what you think. We *do* believe that a further exchange of positions and concerns will be helpful. We have no desire merely to delay the inevitable, but given the stakes here, especially those concerning new and – at best – untested statutory provisions, some further discussion would likely be productive. We hope, as always, that we can avoid further dispute. But even if not, further discussion could narrow our disagreements and present them more cleanly for any necessary resolution.

For these reasons, we look forward to hearing from you in response to this letter.

Very truly yours,

J. D. Obenberger

Digitally signed by J. D. Obenberger
DN: cn=J. D. Obenberger, c=US,
o=J. D. Obenberger and Associates
Location: Chicago, IL
Date: 2009.07.07 19:43:26 -05'00'